**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-3254

MICHAEL MEEHAN

Plaintiff,

v.

CITY OF ARVADA;

BRIAN LAAS, Arvada Police Department Officer, in his individual capacity;

Defendants.

---

## COMPLAINT AND JURY DEMAND

---

### INTRODUCTION

1.      On January 3, 2022, the Individual Defendant, Arvada Police Department ("APD") Officer Brian Laas, sent his K9 Rudy to bite Michael Meehan, who was asleep in a bedroom closet in his mother's house. At the time Defendant Laas sent his K9 to bite Mr. Meehan, Defendant Laas had no information that Mr. Meehan posed a danger to anyone, that he was resisting arrest, or that he was fleeing. Regardless, on Defendant Laas's orders, K9 Rudy attacked Mr. Meehan, sinking its teeth into Mr. Meehan's throat, puncturing his trachea and nearly killing him. Defendant Laas's choice to have his K9 brutalize Mr. Meehan despite Mr. Meehan not resisting arrest, making no efforts to flee, and posing no threat to anyone constituted excessive force under both the United States and Colorado Constitutions.

2.      Defendant Laas engaged in this clear act of brutality because it was permitted under Arvada's unconstitutional K9 policy. Shockingly, despite long-established law holding that a police

K9 bite represents a severe quantum of force, the City of Arvada chose to enact a K9 policy for its police department that did not define the use of a K9 to bite and apprehend a person as a use of force. In conformity with this unconstitutional choice, Arvada's K9 policy permitted Arvada police officers to use a K9 to bite and apprehend a subject in situations where little or no force would be constitutionally permissible.

3.      In recent years, Defendant Laas repeatedly deployed his K9 in ways that complied with Arvada's unconstitutional policy, but which represented excessive force. In each instance, the City of Arvada, through its police department, reviewed Defendant Laas's conduct based on its supervisory authority over him and did not discipline him because his actions complied with Arvada's unconstitutional policy. During one of these reviews, an APD Commander wrote that Arvada's K9 policy was problematic because its vagueness had permitted Defendant Laas to use his K9 in a situation where it caused a massive and unnecessary injury like the one Mr. Meehan suffered. Despite the Commander's warning, Arvada maintained its unconstitutional K9 deployment policy.

4.      Additionally, while Arvada had Defendant Laas trained extensively on *how* to deploy his K9 to apprehend a subject, it gave him no training concerning *when* it is permissible to use a K9 to apprehend a subject. The only instruction Defendant Laas received concerning when he was permitted to use his K9 to bite and apprehend a subject was Arvada's unconstitutional policy.

5.      By enacting an unconstitutional K9 policy that permitted the deployment of a K9 when a K9 bite would represent excessive force, by repeatedly approving of Defendant Laas's practice of deploying his K9 in a manner that represented excessive force, and by failing to train Defendant Laas concerning when it is and is not constitutionally permissible to use a K9 to bite and apprehend a subject, the City of Arvada caused Defendant Laas to send his K9 to bite Mr. Meehan while he lay on the floor of his mother's house, asleep and defenseless.

## JURISDICTION & VENUE

6.     This is a civil rights action for monetary damages, declaratory relief, and injunctive relief, brought pursuant to 42 U.S.C. § 1983 and C.R.S. § 13-21-121.

7.     This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 2201-02. Mr. Meehan seeks attorney fees and costs. 42 U.S.C. § 1988; C.R.S. § 13-21-121.

8.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All the events alleged herein occurred in the State of Colorado, and all the parties were residents of and domiciled in the State at the time of the events giving rise to this Complaint.

## PARTIES

9.     Michael Meehan is the plaintiff. At all relevant times he was a resident of Colorado.

10.     The City of Arvada ("Arvada") is a municipality in Colorado. Arvada enforces state and local law through its law enforcement agency, APD. At all relevant times, Arvada employed and was responsible for the direction, supervision, training, and discipline of APD officers, including Defendant Brian Laas. All allegations herein directed at APD are directed at Arvada, as APD is not a legal entity separate from Arvada.

11.     Brian Laas was, at all relevant times, a police officer employed by Arvada. At all relevant times, Defendant Laas was acting within the scope of his official duties as a P.O.S.T.-certified peace officer in his capacity as a police officer with APD.

## FACTUAL ALLEGATIONS

### The Incident

12.     On January 3, 2022, Michael Meehan was at his mother's house. Though there was a protection order between Mr. Meehan and his mother, Mr. Meehan's mother had nonetheless invited Mr. Meehan over for New Year's, and he stayed with her for a couple of days thereafter.

13.     On January 3, 2022, Mr. Meehan and his mother had both been drinking and it caused them to argue. As a result of the argument, Mr. Meehan's mother called the police.

14.     APD Officer Nam Tran initially responded to the call. Mr. Meehan's mother reported to Officer Tran that nothing physical had happened between her and her son that day, but that she wanted her son to leave and he had not left.

15.     While Officer Tran was having this initial conversation with Mr. Meehan's mother, Officer Tran claims he saw Mr. Meehan come to the front door of the house from inside. Officer Tran claims he asked Mr. Meehan to come outside and talk, but that instead Mr. Meehan went back inside and closed the door.

16.     Officer Tran asked other officers to respond and then continued his conversation with Mr. Meehan's mother. He determined there was a protection order prohibiting Mr. Meehan from being in contact with his mother and aired this to the other officers who were on their way.

17.     Additional APD officers soon arrived, including Officers Megan Esslinger, Zachary Tickel, and Defendant Laas who brought his K9, Rudy, as well as Sergeant Robert Brooks.

18.     While Officers Esslinger, Tickel, Sergeant Brooks, and Defendant Laas were present, they did not see Mr. Meehan leave the house prior to Defendant Laas sending his K9 to bite and apprehend Mr. Meehan.

19.     Prior to Defendant Laas sending his K9 to bite and apprehend Mr. Meehan, Officer Tickel saw a light turn off in an upstairs window, demonstrating that Mr. Meehan was inside.

20.     After hearing about the light turning off from Officer Tickel, another APD officer confirmed with Mr. Meehan's mother that nobody other than Mr. Meehan was in the house.

21.     At that point, the APD officers present believed they had probable cause to arrest Mr. Meehan for violating the protection order that prohibited contact between him and his mother.

22.     At that point, the APD officers present had no information that Mr. Meehan was violent, had been violent in the past, had a weapon, had resisted arrest, was fleeing, or that he posed a threat to any officer or anyone in the community.

23.     Despite this, the officers chose to use force.

24.     Defendant Laas and Officers Esslinger, Tickel, Tran, and Sergeant Brooks conferred and decided on a plan for apprehending Mr. Meehan. Under their plan, Officer Tran and Sergeant Brooks would remain outside and watch the front door while the other three officers would enter the house through an unlocked back door with Defendant Laas's K9, Rudy. Defendant Laas would then use his K9 to bite and apprehend Mr. Meehan. Having decided on the plan, the five officers put it into effect.

25.     Using K9 Rudy, Defendant Laas and Officers Esslinger and Tickel searched the house. According to their reports, they made K9 announcements along the way. Mr. Meehan, asleep due to alcohol consumption, could not hear them.

26.     First, Defendant Laas and Officers Esslinger and Tickel determined that Mr. Meehan was not on the first floor.

27.     Defendant Laas and Officers Esslinger and Tickel then proceeded upstairs, where Officer Tickel had seen a light get turned off.

28.     Once upstairs, Defendant Laas and Officers Esslinger and Tickel first searched each of the rooms other than the one where Officer Tickel had seen the light turn off. They did not find Mr. Meehan in those rooms.

29.     At that point, Defendant Laas directed K9 Rudy to the final upstairs bedroom, the one in which Officer Tickel had seen someone turn out a light.

30.     K9 Rudy alerted, indicating that a person was inside.

31.     Defendant Laas then made additional K9 announcements and sent K9 Rudy to search the room. Rudy searched the room once, finding no one.

32.     Defendant Laas then followed K9 Rudy into the room and checked underneath the bed, also finding no one.

33.     K9 Rudy then came back to Defendant Laas and was about to leave the room, at which point K9 Rudy gave a potential alert to human scent as K9 Rudy was exiting the room.

34.     Based on this possible alert, Defendant Laas exited the room and sent K9 Rudy back in to search the room again.

35.     Rudy first began searching the bed area.

36.     Defendant Laas also re-entered the room and noticed that there was a closet behind the bedroom door.

37.     Defendant Laas pushed the closet door open.

38.     Defendant Laas then exited the room, followed by K9 Rudy.

39.     While K9 Rudy was exiting, he did a "head snap" as he walked past the now-open closet door.

40.     To Defendant Laas, the "head snap" was a strong indicator that his K9 had detected human odor in the closet.

41.     At that point, Defendant Laas decided to send K9 Rudy into the bedroom closet to bite and apprehend Mr. Meehan.

42.     At the time Defendant Laas made this decision, he had no information Mr. Meehan was dangerous, possessed a weapon, had resisted arrest, was fleeing, or posed a threat to anyone.

43.     At the time Defendant Laas made this decision, he believed Mr. Meehan was in the bedroom closet, based on K9 Rudy's alert.

44.     At the time Defendant Laas made this decision, Mr. Meehan was asleep on the floor
of the closet.

45.     Without any information that Mr. Meehan was dangerous, possessed a weapon, had
resisted arrest, was trying to flee, or posed a threat to anyone, Defendant Laas nonetheless sent his
K9 Rudy back into the room and directed Rudy to search the closet.

46.     Mr. Meehan, asleep on the floor of the bedroom closet, was shocked awake by the
feeling of a police K9's teeth sinking into his throat and its jaws clamping onto his neck.

47.     Mr. Meehan and K9 Rudy rolled out of the closet with K9 Rudy's teeth deep in Mr.
Meehan's neck.

48.     As a natural reaction, Mr. Meehan began trying to save his own life by attempting to
remove K9 Rudy from his throat. Defendant Laas watched this happen.

49.     Upon seeing Rudy with his teeth in another human being's neck, Defendant Laas did
not immediately order Rudy to release. Instead, Defendant Laas told Mr. Meehan that he would
order Rudy to release if Mr. Meehan would stop fighting with Rudy.

50.     Mr. Meehan, engaged in a struggle for his very life with the jaws of an attack dog
clamped on his throat, could not comply.

51.     Defendant Laas let Rudy continue his attempts to kill Mr. Meehan while Defendant
Laas yelled at Mr. Meehan to stop fighting with Rudy. Defendant Laas did not intervene to stop the
near-deadly use of force his K9 was inflicting right in front of him.

52.     Finally, after giving Rudy additional time to inflict grievous injuries on Mr. Meehan,
Defendant Laas grabbed K9 Rudy by the collar. He still did not order K9 Rudy to release.

53.     Instead, Defendant Laas held K9 Rudy by the collar while K9 Rudy's teeth were still
in Mr. Meehan's throat.

54.     Defendant Laas yelled that once Mr. Meehan stopped struggling with K9 Rudy, Defendant Laas would order the K9 to release.

55.     Mr. Meehan, in an existential struggle for his very life, was not physically able to let go of the K9, and fortunately so; if he had, he would be dead.

56.     Rather than help Mr. Meehan, Defendant Laas continued to yell at him to let go of the K9 that was trying to kill him.

57.     When Defendant Laas began yelling for Mr. Meehan to let go of Rudy, Officers Tickel and Esslinger came into the room.

58.     Rather than try to get Rudy off Mr. Meehan's throat, Officer Tickel instead grabbed Mr. Meehan's arm to apply a handcuff. By doing this, Officer Tickel participated in the unconstitutional use of force and enabled K9 Rudy to continue biting and re-biting Mr. Meehan's neck and throat.

59.     Only Officer Esslinger appeared to appreciate the horrific gravity of what Defendant Laas and K9 Rudy had just done. She screamed to her fellow officers that the K9 was biting Mr. Meehan on his throat and requested that an ambulance respond as fast as possible.

60.     At that point, after watching and doing nothing to intervene as Rudy inflicted near-fatal injuries on Mr. Meehan's throat, Defendant Laas finally removed K9 Rudy from the bite.

61.     Officers Esslinger and Tickel then dragged Mr. Meehan away from K9 Rudy and into another room.

62.     Officer Esslinger saw holes in Mr. Meehan's throat near his trachea, which bubbled as Mr. Meehan struggled to breathe.

63.     When Officer Esslinger pressed on the holes in Mr. Meehan's throat to try to make Mr. Meehan's breathing easier, she inadvertently made Mr. Meehan feel like she was choking him.

64.    Mr. Meehan began going in and out of consciousness. He grabbed Officer

Esslinger's hand and begged her not to let him die, saying over and over again that he did not want

to die. Officer Tickel heard Mr. Meehan's pleas as well.

65.    Officer Tran, charged with documenting the incident, took photos of the house, but

took no pictures of Mr. Meehan's injuries before the paramedics' intervention.

66.    Fortunately the hospital did, documenting Rudy's near-fatal bites to the front and

back of Mr. Meehan's neck:





67. Mr. Meehan got drunk inside his mother's house, where he acknowledges he was not supposed to be, and fell asleep in a closet. For that, Defendant Laas used K9 Rudy to nearly kill him.

### Arvada's Responsibility for the Incident

68. The blame for this horrific incident lies as much with the City of Arvada as it does with Defendant Laas.

69. Based on the information Defendant Laas had, under the policies, practices, and training regimens of a reasonable police department, he would have known that he was not permitted to use *any* force to apprehend Mr. Meehan, and certainly was not permitted to use the high degree of force entailed by a K9 bite.

70.     However, at that time, APD maintained an unreasonable and unconstitutional K9

policy that permitted the use of a K9 to find and apprehend a subject with a bite both when the use

of force was not permitted and when only minimal force was permitted.

71.     Under APD Policy 318 governing the K9 unit in effect at the time of the incident,

APD did not treat the use of a K9 to apprehend a subject with a bite as a use of force.

72.     APD Policy 318 did not even contain the word "force."

73.     APD Policy 318 did not instruct Arvada K9 officers that they were only permitted to

use a K9 to apprehend a subject when the degree of force entailed by a K9 bite would be

constitutionally permissible.

74.     Instead, Arvada Police Department Policy 318.2 (contained within policy 318), which

set Arvada's guidelines for the use of K9s, instructed Arvada K9 officers that they were permitted to

use their K9:

> [T]o locate and apprehend a suspect if the canine handler reasonably believes that the
> individual has either committed or threatened to commit <u>any offense</u> and if any of
> the following conditions exist:
>
> (a)  There is a reasonable belief the individual poses an imminent threat of violence
>      or serious harm to the public, any officer or the handler.
> (b)  The individual is physically resisting or threatening to resist arrest and the use of
>      a canine reasonably appears to be necessary to overcome such resistance.
> (c)  <u>The individual is believed to be concealed in an area where entry by other than</u>
>      <u>the canine would pose a threat to the safety of officers or the public.</u>
> (d)  It is recognized that situations may arise that do not fall within the provisions set
>      forth in this policy. In any such case, a standard of objective reasonableness shall
>      be used to review the decision to use a canine in view of the totality of the
>      circumstances.

75.     Through APD policy, practice, and training, Arvada informs its officers that entering

a building where a suspect is present but not yet located poses a threat to the safety of the officer.

76.     As a result, under Arvada's K9 deployment policy in effect on January 3, 2022, it was permissible for an Arvada K9 officer to deploy his K9 to apprehend a subject any time the subject was inside a building or met any of the other criteria stated in the policy, no matter the crime the subject had allegedly committed.

77.     While subsection 318.2.1 of Arvada's K9 policy instructed K9 officers to consider, among other things, the *Graham* factors relevant to the use of force before using a K9 to apprehend a subject, it did not require that a K9 handler determine that the use of force was justified under the *Graham* factors before sending a K9 to bite a subject, let alone that the high degree of force entailed by a K9 bite was justified.

78.     Instead, as quoted herein, under the relevant Arvada policy in effect on January 3, 2022, the only prerequisite for deploying a K9 to bite a subject who was inside a building was that the K9 handler have a reasonable belief the person had committed any crime.

79.     Such an unconstitutional policy was destined to lead to a horrific incident such as what happened to Mr. Meehan.

80.     Furthermore, in addition to permitting the use of a K9 to apprehend any subject in a building, Arvada's K9 deployment policy 318.2 also permitted its K9 officers to use a K9 to apprehend a subject any time the K9 officer had information relevant to either the second or third *Graham* factor (whether the subject poses an immediate threat, whether the subject was resisting arrest or attempting to flee), without consideration of the other factors.

81.     Under prevailing caselaw, to determine whether force is justified and the degree of force that is permissible, the inquiry is focused on the totality of the circumstances, including a consideration of all three *Graham* factors (with the first factor being the severity of the crime).

82.     Arvada's K9 deployment policy disregarded this mandate. Instead, Arvada's K9 policy empowered Arvada K9 officers to deploy a K9 to bite a subject based on a mere belief that a subject posed a threat or a purely verbal failure to immediately comply with orders, regardless of the other *Graham* factors or the totality of the circumstances.

83.     Reasonable police departments' K9 policies treat a K9 apprehension with a bite as a use of force.

84.     Reasonable police departments' K9 policies require that the quantum of force entailed by a K9 bite be justified before a K9 is deployed to bite.

85.     Long-established law treats a K9 bite as not only a use of force, but a severe one.[1]

86.     APD's K9 policy in effect on January 2, 2022 did not treat a K9 apprehension made by a bite as a use of force.

87.     In line with Arvada's choice not to treat a K9 deployment as a use of force, Arvada also chose not to give its K9 officers training on when, from a use of force perspective, it is and is not permissible to deploy a K9 to bite a subject.

88.     Having requested, received, and reviewed all Arvada's "training materials that relate to the use or training of a K9 and that were used at any time from January 1, 2017, to the present," two things were immediately apparent. First, Arvada has its K9 officers complete a significant amount of training concerning how to do the tasks a K9 officer may be requested to complete, whether that is apprehending a person, finding narcotics, or finding explosives.

---

[1] *See Kerr v. West Palm Beach*, 875 F.2d 1546, 1550 (11th Cir. 1989) (with use of "bite and hold" K9s such as Arvada's, "suspects often suffer serious injury from multiple bites received during the course of an apprehension"); *Becker v. Elfreich*, 821 F.3d 920, 926 (7th Cir. 2016) (use of K9 is at higher end of force spectrum); *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) (police K9 bite is "severe" force).

89.     Second, Arvada gives its K9 officers no training whatsoever concerning under what circumstances it is either permissible or advisable to use a K9 to apprehend a person.

90.     Thus, while Arvada does a good job training its K9 officers *how* to use their K9s, it entirely fails to train its officers *when* to use their K9s.

91.     This failure to train, in combination with the unconstitutional deployment policy detailed above, directly caused what happened to Mr. Meehan.

92.     Over the last few years, Arvada's unconstitutional K9 deployment policy and failure to train Defendant Laas properly has led Arvada to repeatedly approve the practice of Defendant Laas using unconstitutional force with his K9.

93.     In Use of Force Review 19-13 based on a 2019 incident, Defendant Laas used K9 Rudy to apprehend a man in his own house who was alleged to have committed misdemeanor domestic violence. Defendant Laas observed the man lying in his bed, awake. At that point, the man had not engaged in any active resistance, he had not fled, and he was wanted for only misdemeanor charges. As a result, under the *Graham* factors, at most minimal force was permissible. However, the man was wanted for an offense, and he was in a room inside a building. As a result, he met the criteria for a K9 apprehension under Arvada's unconstitutional policy. Defendant Laas deployed his K9, resulting in significant injury. This represented excessive force.

 

94.     Despite this K9 bite representing clear excessive force under the *Graham* factors, Arvada found Defendant Laas's unconstitutional use of force justified under Arvada's K9 policy and issued no discipline.

95.     In Use of Force Review 19-33 based on a 2019 incident, Defendant Laas used K9 Rudy to arrest a homeless man on an old warrant for a drug case. Defendant Laas saw the man walking along a narrow creek and ordered him to stop, but the man kept walking. Defendant Laas then drove to where he could access the creek, got K9 Rudy out of his car, and confronted the man. When the man did not immediately show his hands and jumped to the other side of the creek, Defendant Laas sent K9 Rudy to apprehend him. K9 Rudy bit the man on his upper thigh, severing the man's femoral artery and causing a gaping wound. During the struggle, the man and K9 Rudy were washed 20-30 feet downstream in the creek, creating a significant drowning hazard. The man required a makeshift tourniquet and emergency surgery to save his life due to the severed femoral artery. After being apprehended, the man kept repeating that he "didn't do anything wrong" and only jumped to the other side of the creek because he was scared of K9 Rudy. This represented excessive force.

 

96.     Despite this K9 bite representing clear excessive force under the *Graham* factors, Arvada's Use of Force Review found Defendant Laas's unconstitutional use of force justified under Arvada's K9 policy. The man posed no threat to any officer or community member, was not known to be armed or dangerous, and had engaged in at most minor flight, walking away from Defendant Laas and jumping 5 feet to the other side of the creek. The Use of Force Review described the reason for the K9 deployment as only "verbal non-compliance." Nonetheless, under Arvada's unconstitutional K9 policy, the City found the deployment was justified. Arvada therefore did not discipline Defendant Laas.

97.     Use of Force Review 19-33 explicitly put Arvada on notice of the constitutional deficiencies in its K9 deployment policy. As a part of the review, Commander Robert VanderVeen wrote: "I realize [Defendant Laas] was within policy to track the suspect and later deploy the dog, but it seems the policy is very vague."

98.     Use of Force Review 19-33 thus presented Arvada with a clear example of how its K9 policy permitted excessive force. After reviewing the policy and an incident of significant force the policy permitted, even an APD Commander found the K9 policy vague in terms of making clear what uses of a K9 were prohibited.

99.     In response to Commander VanderVeen's assessment, Arvada made no changes to the policy and instituted no additional training. Instead, the unconstitutional policy remained in effect and was in force on the date Defendant Laas sent K9 Rudy to attack Mr. Meehan.

100.     Arvada's choice to keep its K9 policy as-is even after seeing firsthand how it permitted life-threatening excessive force, and after being told by one of its own Commanders that the policy was vague such that it permitted excessive force, represents deliberate indifference.

101.    In Use of Force Review 18-28 based on a 2018 incident, in a situation very similar to

what happened with Mr. Meehan, Defendant Laas used K9 Rudy to bite an unarmed man who had

passed out from drug use in the closet of a vacant apartment. The man was wanted for a non-violent

property crime. Using K9 Rudy, Defendant Laas determined that the man was inside a bedroom

closet. Rather than recall K9 Rudy and have Defendant Laas and his fellow officers open the door

of the closet, Defendant Laas let K9 Rudy go into the closet to attack. As a result, an unconscious

man was subjected to entirely unnecessary unconstitutional force.

102.    For the same reasons that apply in Mr. Meehan's case, this use of excessive force was

permissible under Arvada's unconstitutional K9 policy. As a result, even though this was a clear

example of excessive force, Arvada once again found Defendant Laas's use of K9 Rudy permissible

under Arvada policy.



103.    In Use of Force Review 18-33 based on a 2018 incident, Defendant Laas used K9

Rudy to locate a suspect who had fled a traffic accident and hidden under a travel trailer. While

Defendant Laas gave K9 warnings when he began his search, he did not give additional K9 warnings

when he reached the trailer. Further, when K9 Rudy alerted to human odor under the travel trailer, Defendant Laas did not hold K9 Rudy back and give a new set of K9 warnings or otherwise give the subject a chance to surrender peacefully. Instead, Defendant Laas let K9 Rudy go under the travel trailer and bite the subject, causing unnecessary and unconstitutional injury.

104.    When Defendant Laas permitted K9 Rudy to bite the subject, the subject had stopped fleeing, was not resisting arrest, posed no threat to any officer or member of the community, and was wanted only for crimes related to the traffic accident. Nonetheless, under Arvada's unconstitutional K9 deployment policy, Arvada found Defendant Laas's use of Rudy justified and issued him no discipline.



105.    Mr. Meehan has only been able to review the Use of Force reports from Defendant Laas's K9 deployments. However, Arvada has numerous other K9 officers. On information and belief, Arvada's practice of permitting its K9 officers to deploy a K9 to apprehend and bite a subject when the degree of force entailed by a K9 bite is not justified extends beyond Defendant Laas to Arvada's other K9 officers.

106.    The incidents recited in this Complaint represent only a fraction of the total instances of unconstitutional excessive force by Arvada's K9 officers done in compliance with Arvada's unconstitutional K9 policy.

107.    Arvada has been put on notice that its K9 policy is impermissibly vague, permitting the use of a K9 to apprehend a person when such a bite would represent excessive force.

108.    Arvada was also put on notice of the specific problem with Arvada's K9 deployment policy that led to what happened to Mr. Meehan: that a wanted party who has been using alcohol or controlled substances may lose consciousness, rendering them incapable of hearing or responding to K9 announcements even though they pose no threat of violence, resistance, or flight, but that Arvada's K9 policy permitted sending a K9 to bite such a person even though they posed no threat.

109.    Arvada was also on notice that, based on its K9 policy, Defendant Laas was regularly using his K9 to bite people where the bite was not justified under the *Graham* factors.

110.    In response to this information, Arvada chose to maintain its unconstitutional and vague K9 deployment policy, institute no training concerning when it is and is not appropriate to use a K9 to apprehend a subject, and to not once exercise its supervisory authority over Defendant Laas to discipline or even reprimand him for his repeated uses of excessive force with K9 Rudy. Through these actions, Arvada created a practice of tolerating excessive force by its K9 officers generally and Defendant Laas in specific.

### C.R.S. § 13-17-201(2)

111.    The Colorado Supreme Court has yet to issue rulings concerning the elements of the state cause of action Mr. Meehan brings in this Complaint.

112.    Pursuant to C.R.S. § 13-17-201(2), Mr. Meehan brings the below state cause of action for the purpose of seeking a remedy for the violation of his rights he has suffered and also with the

express purpose to: (a) extend and modify existing precedent and create new precedent on matters of first impression concerning the elements of the state cause of action he brings in this Complaint; and (b) establish the meaning of the state cause of action he brings in this Complaint.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### C.R.S. § 13-21-131; Colo. Const. art. II, sec. 7 - Excessive Force
### Defendant Laas

113.    Mr. Meehan incorporates all other paragraphs as if fully set forth herein.

114.    At all relevant times, Defendant Laas was a peace officer.

115.    At all relevant times, Defendant Laas was acting as a peace officer in his capacity as an APD law enforcement officer.

116.    Mr. Meehan had a protected right, under article II, section 7 of the Colorado Constitution, not to be subjected to excessive force by law enforcement.

117.    Defendant Laas, by deploying his K9 Rudy, used force on Mr. Meehan which, judged from the perspective of a reasonable officer on the scene, was unreasonable.

118.    When Defendant Laas used excessive force against Mr. Meehan, he violated Mr. Meehan's constitutional rights guaranteed by article II, section 7 of the Colorado Constitution.

119.    Defendant Laas caused Mr. Meehan to be deprived of individual rights secured by the bill of rights of the Colorado Constitution.

120.    Defendant Laas's actions caused Mr. Meehan substantial harm and were a proximate cause of Mr. Meehan's damages.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983; Fourth Amendment Municipal Liability
### Defendant City of Arvada

121.    Mr. Meehan incorporates all other paragraphs as if fully set forth herein.

122.    Mr. Meehan had a protected right, under the Fourth Amendment of the United States Constitution, not to be subjected to excessive force by law enforcement.

123.    The acts and omissions detailed herein in which Defendant Laas engaged were done because of and pursuant to the customs, practices, policies, supervision, and/or training of Arvada described in this Complaint.

124.    As alleged in detail herein, Defendant Arvada had an unconstitutional K9 policy. This policy was unconstitutional on its face and as it was applied to Mr. Meehan by Defendant Laas.

125.    Under Arvada's unconstitutional K9 policy, Arvada permitted its K9 officers, including Defendant Laas, to deploy a K9 to bite and apprehend a subject when the degree of force entailed by a K9 bite would be constitutionally excessive.

126.    As alleged in detail herein, Defendant Arvada failed to train Defendant Laas concerning when, under the rules governing the constitutional use of force, it is and is not permissible to deploy a K9 to bite and apprehend a subject.

127.    As alleged in detail herein, Defendant Arvada failed to properly supervise and/or discipline Defendant Laas to ensure he did not engage in excessive force in his K9 deployments.

128.    As alleged in detail herein, through the failures detailed herein, Defendant Arvada established a practice of tolerating excessive force by its K9 officers generally and Defendant Laas in specific.

129.    In sum, Arvada (1) established an unconstitutional K9 deployment policy, (2) maintained that unconstitutional K9 deployment policy in the face of concerns raised by an APD Commander that the policy was vague, leading it to permit instances of excessive force, (3) failed to train Defendant Laas and Arvada's other K9 officers concerning when the degree of force entailed by a K9 bite is reasonable or constitutionally permissible, (4) failed to properly supervise or

discipline Defendant Laas and Arvada's other K9 officers when they used their K9s to engage in

excessive force, and (5) established a practice of tolerating excessive force by Defendant Laas and

Arvada's other K9 officers. These actions, both individually and viewed as a whole, demonstrate

Arvada's deliberate indifference to excessive force committed by its K9 officers generally and

Defendant Laas in specific and caused what happened to Mr. Meehan.

### **PRAYER FOR RELIEF**

WHEREFORE, Mr. Meehan respectfully requests that this Court enter judgment in his

favor and against Defendants, and award him all relief as allowed by law and equity, including, but

not limited to:

a.  A judgment that the acts of Defendants described herein violated the Colorado
    Constitution and the United States Constitution;

b.  Compensatory damages according to proof at trial, including, but not limited to those
    for past and future pecuniary and non-pecuniary losses, physical and mental pain,
    humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of
    security and individual dignity, and other non-pecuniary losses;

c.  Punitive or exemplary damages for all claims as allowed by law in an amount to be
    determined at trial;

d.  Attorney's fees and costs;

e.  Prejudgment and post-judgment interest at the highest possible rate; and

f.  Such further relief as the Court may deem just, proper, and appropriate.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated: December 11, 2023


/s Adam Frank
Adam Frank
Cameron Bedard
Frank Law Office LLC
1133 N Pennsylvania St.
Denver, CO 80203
Phone: (303) 800-8222
Fax: (303) 800-9122
adam@franklawoffice.com
cameron@franklawoffice.com
*Attorneys for Mr. Meehan*